DAVID R. ZARO (BAR NO. 124334)
TED FATES (BAR NO. 227809)
TIM C. HSU (BAR NO. 279208)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
515 South Figueroa Street, Ninth Floor
Los Angeles, California 90071-3309
Phone: (213) 622-5555
Fax: (213) 620-8816
E-Mail: dzaro@allenmatkins.com
        tfates@allenmatkins.com
        thsu@allenmatkins.com

Attorneys for Court-appointed Receiver
KRISTA L. FREITAG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| KRISTA L. FREITAG, Court-Appointed Permanent Receiver for World Capital Market Inc.; WCM777 Inc.; WCM777 Ltd. d/b/a WCM777 Enterprises, Inc.; Kingdom Capital Market, LLC; Manna Holding Group, LLC; Manna Source International, Inc.; WCM Resources, Inc.; ToPacific Inc.; To Pacific Inc.; and their subsidiaries and affiliates,<br><br>Plaintiff,<br><br>v.<br><br>SUE WANG aka SU E. WANG; JIANJUN WANG; XIAOMEI DENG; HUAJIAN WU; MANA FASHION INC., a California corporation; JJ SPARKLES, INC., a California corporation; YUANHAO, INC., a California corporation; SAZA INVESTMENT LLC, a California limited liability company; GENERGEIA INC., a California corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:15-CV-2147-JFW-MRW<br><br>STATEMENT OF DECISION |

**Error! Unknown document property name..Error! Unknown**

STATEMENT OF DECISION

Having reviewed the pleadings and papers on file in connection with the Motion for Summary Judgment ("Motion") filed by Plaintiff Krista L. Freitag ("Receiver"), Court-appointed permanent-receiver for World Capital Market Inc.; WCM777 Inc.; WCM777 Ltd. d/b/a WCM777 Enterprises, Inc.; Kingdom Capital Market, LLC; Manna Holding Group, LLC; Manna Source International, Inc.; WCM Resources, Inc.; ToPacific Inc.; To Pacific Inc.; and their subsidiaries and affiliates (the "Receivership Entities"), the Court hereby finds that there is no genuine issue of material fact and the Receiver is entitled to summary judgment against Defendants Huajian Wu ("Wu") and Yuanhao, Inc. ("Yuanhao") (together, the "Wu Defendants") as a matter of law.

## **FINDINGS OF FACT**

The Court finds that the following facts are undisputed:

1. On or about March 27, 2014, the Commission initiated the SEC Action against the Receivership Entities, Ming Xu a/k/a Phil Ming Xu ("Ming Xu"), a principal of the Receivership Entities, and others, alleging violations of federal securities laws. (Statement of Uncontroverted Facts and Conclusions of Law ("SUF"), ¶ 1.)

2. The Commission petitioned for the Receiver's appointment, and on March 27, 2014, the Court appointed the Receiver as temporary receiver. (SUF, ¶ 2.)

3. On April 10, 2014, the Court entered a Preliminary Injunction appointing the Receiver as permanent receiver for the Receivership Entities. (SUF, ¶¶ 3-4.)

4. ToPacific Inc. and To Pacific Inc. were added as Relief Defendants to the SEC Action on May 7, 2014 and on May 21, 2014, the Court entered an order extending the Receiver's appointment over Relief Defendants ToPacific Inc., and To Pacific Inc. (SUF, ¶¶ 3-4.)

5. Investor deposits were the primary source of virtually all funds distributed to the investors, and the Receivership Entities, including ToPacific, commingled their funds such that the Receivership Entities operated as a unitary enterprise. (SUF, ¶ 5.)

6. There was no significant source of revenue for the Receivership Entities, other than deposits associated with Ponzi scheme. (SUF, ¶¶ 7-10.)

7. Virtually all of the funds of the Receivership Entities, including those held by ToPacific, are ill-gotten gains of the fraudulent WCM777 offering, generated through the operation of the Ponzi scheme. (SUF, ¶ 10.)

8. In the SEC Action, this Court previously found that "[t]he SEC has presented undisputed evidence that the only significant source of funds in Defendants' bank accounts, including the relevant ToPacific account, were proceeds from the unregistered and fraudulent WCM777 offering…." (SUF, ¶ 11.)

9. The Commission's investigation into Ming Xu's activities dates back to October 2013. (SUF, ¶ 12.)

10. Ming Xu's Ponzi scheme was also the subject of independent investigations by the Massachusetts Securities Division, the State of California Department of Business Oversight, and the Colorado Division of Securities, which resulted in the entry of a Consent Order on November 14, 2013 (Mass.), a Desist and Refrain Order in January 8, 2014 (Cal.), and a Consent Cease and Desist Order on January 21, 2014 (Colo.). (SUF, ¶ 13.)

11. In October 2013, Ming Xu's former counsel, Scott Warren, advised him to "stop all operations and cease raising money throughout the world." Mr. Warren further expressed the opinion to Ming Xu that "WCM777 was operating as a Ponzi scheme, illegal in every state, as well as every country of the world. … [and] advised Mr. Xu that WCM777 was an illegal pyramid scheme, and that it violates State and Federal securities laws." (SUF, ¶ 14.)

12. Yuanhao received $500,000 from ToPacific on or around February 28, 2014. (SUF, ¶¶ 15, 22.)

13. The Yuanhao Account had an account balance on February 1, 2014 of slightly over $500. (SUF, ¶ 42.)

14. Yuanhao's bank account had an account balance $93.07 on February 27, 2014 (one day before the payment of $500,000 from ToPacific was deposited). (SUF, ¶ 41.)

15. The payment of $500,000 to Yuanhao by ToPacifc was purportedly made pursuant to an written agreement to purchase garments from Yuanhao dated February 28, 2014 (the "Purchase Agreement"). (SUF, ¶¶ 17-19.)

16. The Purchase Agreement was then purportedly cancelled by Sue Wang. (SUF, ¶ 20.)

17. Wu admits the $500,000 was received by Yuanhao, and of that amount, $100,000 was retained and not returned to the Receivership Entities. (SUF, ¶ 22.)

18. Wu admits no goods or services were ever provided to the Receiverships Entities in exchange for the $500,000 paid by ToPacific. (SUF, ¶ 23.)

19. There are no documents in the Receivership Entities' records to show that any goods or services was provided to the Receivership Entities in exchange for the $500,000 paid to Yuanhao. (SUF, ¶ 24.)

20. Huajian Wu transferred $210,000 from Yuanhao's bank account to his own personal account at east West Bank (the "Wu Account") on March 19, 2014. (SUF, ¶ 27.)

21. Huajian Wu transferred $55,000 from Yuanhao's bank account to the Wu account on March 26, 2014. (SUF, ¶ 28.)

22. Huajian Wu transferred $64,000 from Yuanhao's bank account to the Wu account on April 10, 2014. (SUF, ¶ 29.)

23. Huajian Wu transferred $27,000 from Yuanhao's bank account to the Wu account on April 14, 2014. (SUF, ¶ 30.)

24. The Yuanhao Account had an account balance of negative $6,407.50 on March 31, 2014. (SUF, ¶ 43.)

25. On April 7, 2014, $130,000 was transferred from the Wu Account to Xiaomei Deng's personal bank account at East West Bank with an account number ending in x5531. (SUF, ¶ 45.)

26. On April 28, 2014, $360,000 was transferred from the Wu Account to Sue Wang's personal bank account at East West Bank with an account number ending in x8654. (SUF, ¶ 46.)

27. Wu claims that the transfers of $130,000 and $360,000 to Sue Wang and Xiaomei Deng were to pay for other obligations owed to Sue Wang or her company, JJ Sparkles, but he admits there are no documents evidencing the alleged obligations and cannot recall any details regarding these prior debts. (SUF, ¶ 47.)

28. Wu admits Sue Wang personally instructed and accompanied him to the bank to process the transfers of the $130,000 and the $360,000 to Sue Wang and Xiaomei Deng. (SUF, ¶ 48.)

29. On March 14, 2014, $200,000 was returned to ToPacifc by wire transfer from Yuanhao, and on March 19, 2014, another $200,000 was returned to ToPacific by wire transfer from Wu's personal bank account. (SUF, ¶ 21.)

30. Yuanhao is a company owned and operated by Wu with no other owners or investors, and is purportedly engaged in the business of selling garments sourced from vendors in China. (SUF, ¶ 26.)

31. Yuanhao has no regular employees and is operated solely by Wu himself. (SUF, ¶ 33.)

32. The Purchase Agreement is the single largest documented purchase order Yuanhao has ever received, far exceeding in amount the typical transactions Yuanhao processes, the highest of which is less than $15,000. (SUF, ¶ 34.)

33. Wu claims that Yuanhao often receives purchase orders for "tens of thousands of dollars or over [$]100,000," but admits there are no purchase orders, invoices or other documents to support this claim. (SUF, ¶ 35.)

34. Wu claims that he had placed an order for goods with a vendor in China (the "China Vendor") for 62,500 units of garments to fulfill the agreement to sell garments to ToPacific and paid deposits totaling $102,000 to the China Vendor for the same. (SUF, ¶ 36.)

35. Wu admits no documentation other than two receipts exists to show that any deposits were actually paid to the China Vendor. (SUF, ¶ 37.)

36. Wu claims the deposits was paid to the China Vendor in cash by his relatives in China, and that they obtained the cash from unknown sources to pay the deposits on his behalf. (SUF, ¶ 38.)

37. Wu admits there is no written agreement for the order of goods from the China Vendor. (SUF, ¶ 39.)

38. Wu admits no goods were ever delivered and no refunds provided by the China Vendor even after the order was cancelled. (SUF, ¶ 40.)

## CONCLUSIONS OF LAW

### I. A Presumption of Actual Fraud Exists.

1. Under California's Uniform Fraudulent Transfer Act ("CUFTA"), a transfer is subject to avoidance and recovery when made with (1) actual intent to defraud, or (2) constructive fraudulent intent based on the lack of reasonably equivalent value provided in exchange. *See* Cal. Civ. Code § 3439.04(a); *see also*, *Donell v. Kowell*, 533 F.3d 762, 770-771 (9th Cir. 2007) ("*Kowell*"); *In re Cohen*, 199 B.R. 709, 715-716 (9th Cir. 1996). Here, the Receivership Entities conducted no legitimate business and earned little to no revenue from its purported business operations; did not generate any material revenue other than from funds received from investors in the Ponzi scheme; investor deposits associated with the Ponzi scheme were the primary source of virtually all funds distributed to the investors;

the Receivership Entities, including ToPacific, commingled their funds such that the Entities operated as a unitary enterprise; and virtually all of the funds of the Receiverships Entities, including those held by ToPacific, are ill-gotten gains of the fraudulent Ponzi operations. (SUF, ¶¶ 5-10.) Accordingly, a presumption of actual fraud exists in connection with the transfer of $500,000 to Yuanhao. *Kowell*, 533 F.3d at 767 ("[T]he mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud.") (quoting *In re AFI Holding Inc.*, 525 F.3d 700, 704 (9th Cir. 2008); *In re Cohen*, 199 B.R. at 717 ("Proof of a Ponzi scheme is sufficient to establish the Ponzi operator's actual intent to hinder, delay, or defraud creditors for purposes of actually fraudulent transfers ….").

## II.  Actual Fraud Exists Independent Of The Ponzi Presumption.

2.  Ming Xu was fully aware of the regulatory implications of his fraudulent offerings and Ponzi activities, and had knowledge of imminent enforcement action by the Commission as early as in October 2013—well before the $500,000 was transferred to Yuanhao. (SUF, ¶¶ 12-13.) In addition, because the Receivership Entities, including ToPacific, were operated as a Ponzi scheme, they were insolvent by definition. *See U.S. v. Treadwell*, 593 F.3d 990, 993 n. 2 (9th Cir. 2010); *see also*, *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 186 (5th Cir. 2013); *Kowell*, 533 F.3d at 770-771. The $500,000 transferred to Yuanhao was not disclosed to any investors, and although the payment was made using Receivership Entities' funds, the $100,000 Wu retained was never returned. (SUF, ¶¶ 15, 22.) Moreover, there was no value conveyed to the Receivership Entities, as Wu has admitted. (SUF, ¶¶ 23-24.) Accordingly, the circumstances under which Ming Xu paid $500,000 to Yuanhao (using ToPacific's funds) show Ming Xu acted with actual intent to defraud investors in the Ponzi scheme by transferring funds to Yuanhao and funneling monies through Wu's personal account for the benefit of Sue Wang and Xiaomei Deng. Cal. Civ. Code § 3439(b) (setting forth factors upon which actual fraudulent intent may be found).

**III. The $500,000 Transferred To Yuanhao Is Also Constructive Fraudulent.**

3. As explained above, it is not subject to any reasonable dispute that the Receivership Entities operated a Ponzi scheme, proof of which satisfies the insolvency requirements of constructive fraud. Thus, the only remaining inquiry to establish constructive fraud is whether the $500,000 was received in good faith by Yuanhao and whether reasonably equivalent value was provided in exchange. *See* Cal. Civ. Code § 3439.04(a)(2).

4. Here, no value was provided in exchange for the funds paid to the Wu Defendants. As Wu admits, no goods or services were provided at all to any of the Receivership Entities in exchange for the $500,000 that was paid. (SUF, ¶ 23.) The Wu Defendants also did not receive the funds in good faith. There are no documents showing Yuanhao had ever handled transactions of this size, and the only two receipts purporting to show deposits paid by Yuanhao to procure garments for the sale to ToPacific are unsupported by any other documents showing the deposits were actually paid. (SUF, ¶¶ 34-40.) Accordingly to Wu, the vendor was paid in cash by his family members in China. (SUF, ¶ 38.) Wu admits, however, there was no written agreement with the vendor for the purported purchase of garments, despite the fact that the order was for more than 62,000 garments, and no goods were ever delivered or refunds provided even after the order was cancelled. (SUF, ¶ 40.) The investor funds paid to the Wu Defendants, or at least part of them, were also immediately passed on to Sue Wang's and Xiaomei Deng's personal bank accounts with no documentation to support Wu's claim that these transfers were to pay pre-existing obligations. (SUF, ¶¶ 45-48.) In short, the facts demonstrate there was no legitimate purpose for the initial payment of $500,000 to Yuanhao and no legitimate purpose for the subsequent transfer of funds to Sue Wang and Xiaomei Deng. Rather, the apparent purpose of the entire series of transfers was to siphon monies out of the Receivership Entities for the benefit of Ming Xu, Sue Wang, and their immediate family members. Accordingly, as a matter of law, the Wu

Defendants cannot show they provided reasonably equivalent value in exchange for the $100,000, making the full $100,000 subject to disgorgement as a constructive fraudulent transfer.

**IV.     Yuanhao Is The Alter Ego Of Wu.**

5.     Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 538 (2000). A corporate identity may be disregarded—the "corporate veil" pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation. (*Ibid.*) Under the alter ego doctrine, "when the corporate form is used to *perpetuate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose*," the courts will ignore the corporate form and deem the corporations acts to be those of its equitable owners. (*Id.*, emphasis added.) The doctrine is thus intended to prevent misuse of the corporate laws by "the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds." (*Id.*) In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. (*Id.*)

6.     Here, there is no legal distinction between Wu and his company Yuanhao. As he admits, Wu operated Yuanhao without any employees and commonly comingled company funds with his personal funds, often making payments from his personal bank account for company business. (SUF, ¶¶ 26-33.) Wu also admits transferring large sums of funds siphoned from Yuanhao's accounts directly to Sue Wang and her immediate family members at Sue Wang's direction. (SUF, ¶¶ 45-48.) Although he claims these payments were for prior debts owed to

Sue Wang, he admits that there are no documents to support these claims and, naturally, he cannot recall any details regarding these alleged prior debts. (*Id.*) Thus there is no corporate distinction between Yuanhao and Wu, and because the evidence demonstrates that Yuanhao was used as a mere shell by Wu, in cooperation with Sue Wang, to divert investor funds to Sue Wang and her immediate family members, it would be inequitable to allow Wu to escape liability by hiding behind his shell company.

**V.     The $100,000 Is Also Subject To Disgorgement Under The Receiver's Claims For Unjust Enrichment And Constructive Trust.**

There is no dispute the Wu Defendants received and retained $100,000 from the Receivership Entities. (*See* SUF, ¶ 22.) These funds were derived from investor proceeds generated through fraudulent offerings in violation of the securities laws and no reasonably equivalent value was provided to the Receivership Entities in exchange. (*Id.* at ¶¶ 5-11, 23-24.) It would thus be patently unjust to allow the Wu Defendants to retain these funds, at the expense of the investors and creditors of the Ponzi scheme. *Lyles v. Sangadeo-Patel*, 225 Cal.App.4th 759 (2014) ("[t]he elements for a claim of unjust enrichment are 'receipt of a benefit and unjust retention of the benefit at the expense of another.'"); *Communist Party v. 522 Valencia, Inc.*, 35 Cal.App.4th 980, 990 (1995) (providing for imposition of constructive trust upon three conditions: "(1) the existence of a *res* (property or some interest in property); (2) the *right* of a complaining party to that res; and (3) some *wrongful* acquisition or detention of the res by another party who is not entitled to it.") (emphasis in original). The Wu Defendants provided no value in exchange for the funds they received and retained, participated and assisted Ming Xu in transferring investors funds to his immediate family members before they

///

///

///

1 could be frozen, and therefore are not entitled to retain the $100,000 over the
2 legitimate claims of investors and creditors of the receivership estate. *FTC v.*
3 *Network Services Depot, Inc.*, 617 F.3d 1127, 1141-42 (9th Cir. 2010).

6 Dated: December 1, 2015

                                                Hon. John F. Walter
                                                Judge, United States District Court